IN THE U.S. DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| vs. | ) CASE NO.: 2:25cr110 |
| | ) |
| BAILEY BURNETT, | ) |
| Defendant. | ) |
| | ) |

## DEFENSE POSITION WITH RESPECT TO SENTENCING FACTORS

COMES NOW the Defendant, Bailey Burnett, by undersigned counsel, Jarrett L. McCormack and in accordance with § 6A1.2 of the Sentencing Guidelines and Policy Statements and this Court's policy regarding guidelines sentencing, the defense hereby represents that it has received and reviewed the Presentence Investigation Report ("PSR") and Addendum thereto prepared by the United States Probation Officer. There are two unresolved defense objections to the Presentence Investigation Report: one involving the calculation of the sentencing guidelines, and the other concerning Paragraph 77 of the PSR. The defense respectfully withdraws its unresolved objection pertaining to Paragraph 77 of the PSR, as it sufficiently identifies the relevant mitigating factors, below.

## APPLICATION OF THE 18 U.S.C. § 3553 SENTENCING FACTORS SUPPORT A SUBSTANTIAL DOWNWARD VARIANCE FROM THE GUIDELINE RANGE

Pursuant to the factors to be considered in imposing a sentence as set forth in 18 U.S.C. §3553, the Defendant, Bailey Burnett, by counsel, respectfully submits his request that this Honorable Court grant a significant variance from the applicable sentencing guidelines to impose a sentence which is "sufficient, but not greater than necessary" to serve the purposes of sentencing set forth at 18 U.S.C. §3553(a)(1) and (2). Counsel for Mr. Burnett submits that the appropriate

sentence in this matter is a period of imprisonment for one hundred twenty (120) months, followed by ten (10) years of supervised release.

While the Court must consider the Guidelines calculation as part of the sentencing process, the Guidelines merely "serve as one factor among several courts must consider in determining an appropriate sentence." *Kimbrough v. United States,* 552 U S. 85, 90 (2007). Rather than simply impose a sentence within the Guidelines range, the Court must consider the whole range of factors listed in 18 U.S.C. § 3553 and determine the sentence that is "sufficient, but not greater than necessary" to accomplish the goals of sentencing. *Id*. at 101 (quoting 18 U.S.C. § 3553). Indeed, the Court may not even "presume that the Guidelines range is reasonable but must make an individualized assessment based on the facts presented." *Gall v. United States,* 552 U.S. 38, 50 (2007). The sentencing court has wide latitude to impose a sentence below the Guidelines range, "perhaps because (as the Guidelines themselves foresee) the case at hand falls outside the 'heartland' to which the Commission intends individual Guidelines to apply, perhaps because the Guidelines sentence itself fails properly to reflect § 3553(a) considerations, or perhaps because the case warrants a different sentence regardless." *Rita v. United States,* 551 U.S. 338, 351 (2007). Here, the 18 U.S.C. § 3553(a) factors overwhelmingly support a sentence far below the suggested Guidelines Range.  A sentence of imprisonment for one hundred twenty (120) months, followed by ten (10) years of supervised release would be "sufficient, but not greater than necessary" to satisfy the statutory factors.

## **<u>DEFENDANT'S HISTORY AND CHARACTERISTICS</u>**

In determining the particular sentence to be imposed, 18 U.S.C. § 3553(a)(l) requires consideration of the "history and characteristics of the defendant."   Bailey Burnett is 26 years of

age and is a resident of Norfolk, Virginia.  Bailey has remained incarcerated at Western Tidewater Regional Jail since his arrest on August 20, 2025.

Bailey is the son of John Burnett and Shelly Small, and he was born in Fairfax, Virginia on March 25, 2000.  Bailey's parents divorced in 2015 although they continued to be amicable co-parents.  John Burnett is 57 years old and works for a construction company as a project manager while residing in Adamstown, Maryland.  Shelly is 56 years old and works as an Executive Assistant/Transaction Coordinator to two real estate agent clients while residing in Leesburg, Virginia.  Bailey has two biological sisters, Lauren McCracken, 28 years old and Lindsay Burnett, 21 years old.  Laruen lives in Dayton, Ohio, and is a stay-at-home mom with two children.  Lindsay is a social media content manager and resides in Adamstown, Maryland.  Bailey's sisters are fully aware of the current legal matters and remain in full support of their brother.  While Bailey grew up in a middle-class household, his family was not immune to life's troubles.  Bailey's mom has struggled previously with alcohol use disorder, although she has been sober for over two years.  He was raised with his parents' belief in corporal punishment resulting in him receiving physical punishment for negative behavior.  While Bailey may not have liked aspects of his upbringing, he has continued to have a close relationship with his parents, and they have remained supportive during his legal matters.  Bailey has never been married or had any children.

Bailey's childhood included emotional abuse and trauma, including a unique situation which, fortunately or unfortunately, he has very little memory of.  While enrolled at Greenville Elementary School in Northern Virginia, the Vice Principal, Joshua Myers, was arrested by the FBI and later convicted of Receipt of Child Pornography.  While Bailey does not have any specific memory of any sort of sexual abuse or exploitation during this time, he does remember being repeatedly targeted by the Vice Principal for in-school detention which the Vice Principal resided

3

over.  During this time, Bailey also started being bullied, which he reported to his parents but not school officials.  The bullying continued through his high school graduation, and included frequent verbal abuse and name-calling including that Bailey was a homosexual.

## Former Elementary School Assistant Principal Sentenced to 60 Months for Receiving Child Pornography

| | |
|---|---|
| **U.S. Attorney's Office** | **Eastern District of Virginia** |
| December 09, 2011 | (703) 299-3700 |

ALEXANDRIA, VA—A former assistant principal at Greenville Elementary School, Joshua Myers, 29, of Warrenton, Va., was sentenced to 60 months in prison today, followed by five years of supervised release, for receiving child pornography.

Neil H. MacBride, United States Attorney for the Eastern District of Virginia, and James W. McJunkin, Assistant Director in Charge of the FBI's Washington Field Office, made the announcement after sentencing by United States District Court Judge Claude M. Hilton. Myers pled guilty on Sept. 6, 2012.

"While working as an elementary school administrator, Mr. Myers gathered a child porn collection focused on the sexual abuse of young boys and included vile pictures of violent sexual assaults on small children," said U.S. Attorney MacBride. "He told an undercover agent that he had sexually assaulted boys as young as 9, and agents found online chats he had with more than 40 individuals involving child pornography, sex with children, and grooming children to be sexually abused. This case is a sobering reminder that a sexual predator is often someone familiar, and we are committed to doing everything in our power to remove these predators from our communities."

"Mr. Myers was entrusted to protect the welfare of our most precious resource, our children. Instead, he was a predator, victimizing children by distributing and receiving child pornography online," said FBI ADIC McJunkin. "The FBI actively investigates crimes against children and those who victimize innocent children."

According to court documents, Myers was identified through an undercover investigation of individuals using peer-to-peer file-sharing software to view and trade child pornography. Through an online chat with an undercover agent, Myers provided his password to folders on his computer containing child pornography and discussed his sexual interest in minor boys. Using the password provided, the undercover officer obtained through Myer's shared folder several videos containing child pornography, including a video of a minor boy who appears to have been raped by an adult male and a toddler being sexually abused by two adults.

Myers was arrested on June 15, 2011, at his home following a search of his residence. According to court documents, Myers admitted to being the specific user on the peer-to-peer network, admitted to trading child pornography with various users, and indicated he had child pornography stored on a thumb drive in his car and on his work-issued laptop at school. Subsequent forensic analysis of the evidence seized revealed that he was distributing and receiving child pornography online.

The investigation was conducted by the FBI Washington Field Office's Child Exploitation Task Force, with assistance from the Warrenton Police Department and the Northern Virginia/District of Columbia Internet Crimes Against Children (ICAC) Task Force. Special Assistant United States Attorney Maureen C. Cain prosecuted the case on behalf of the United States.

This case was brought as part of Project Safe Childhood, a nationwide initiative to combat the growing epidemic of child sexual exploitation and abuse launched in May 2006 by the Department of Justice. Led by United States Attorneys' Offices and the Criminal Division's Child Exploitation and Obscenity Section (CEOS), Project Safe Childhood marshals federal, state and local resources to better locate, apprehend and prosecute individuals who exploit children via the Internet, as well as to identify and rescue victims. For more information about Project Safe Childhood, please visit www.projectsafechildhood.gov.

A copy of this press release may be found on the website of the United States Attorney's Office for the Eastern District of Virginia at http://www.justice.gov/usao/vae. Related court documents and information may be found on the website of the District Court for the Eastern District of Virginia at http://www.vaed.uscourts.gov or on https://pcl.uscourts.gov.

This content has been reproduced from its original source.

4

Bailey managed bullying and elementary school issues to push forward and graduate from Briar Woods High School on June 15, 2018, in Ashburn, Virginia.  Bailey enrolled in Northern Virginia Community College in 2018 although he quickly withdrew after two weeks and did not go on to receive any further higher education.

In October of 2020, Bailey enlisted in the United States Navy where he worked in Aviation Ordinance and prior to his arrest, had achieved the rank of E-5 (Petty Officer 2nd Class). Bailey was deployed to the Red Sea AOR in support of Operation Prosperity Guardian for nine (9) months, and received numerous awards and medals due to this deployment, as well as being promoted in rank during this deployment. Shortly prior to his arrest, Bailey had been selected to be an A-School Aviation Ordnance trainer in Pensacola, Florida. Overall, Bailey served his country for over 5 years and only recently, in April of 2026, was provided notice that he was discharged from the Navy effective December 24, 2025, with a General Under Honorable Conditions discharge characterization.  During Bailey's service he received the following awards and decorations:

1. Navy & Marine Corps Achievement Ribbon

2. Combat Action Ribbon

3. Navy Unit Commendation

4. Navy E Ribbon

5. Navy Good Conduct Ribbon

6. National Defense Service Ribbon

7. Global War on Terrorism Expeditionary Ribbon

8. Navy Sea Service Deployment Ribbon

9. Navy Marksman Pistol Ribbon

Bailey does not have any substance abuse issues with drugs or alcohol.  Prior to his arrest, Bailey was only a social drinker.  He used marijuana for the first time at 17 years of age, and only infrequently used it for approximately a year.  Bailey has never experimented with or used any other narcotics.  While Bailey agrees that he has no current or past substance abuse issues of any significance, he is agreeable to submit to any substance abuse screening and treatment, as required or suggested by the Bureau of Prisons and/or Probation.

Bailey does have a diagnosis of attention deficit disorder (ADD) and obsessive-compulsive disorder (OCD).  Unfortunately, Bailey discontinued all mental health medications in order for him to enlist in the Navy.  Bailey has suffered from anxiety for some time, however, has not been formally diagnosed or received treatment. As would be expected, a young man Bailey's age, with a complete lack of criminal history, who has been sitting in a regional jail for the past ten months and facing the prospect of at least a decade in federal prison, is highly susceptible to both anxiety and depressive symptoms.  He is very amenable to receiving a mental health assessment by Bureau of Prisons as well as treatment, as he feels it would be greatly beneficial to him.

Bailey has absolutely zero prior history with the criminal justice system, and has never been arrested, including as a juvenile.  It is readily apparent when speaking with Bailey that this legal process and his detainment has shaken him to his very core, and that he will spend the rest of his life, both in custody, on supervised release, and beyond, living a very productive and lawful life.

It is well recognized in consideration of the sentencing factors under 18 U.S.C. §3553 that family ties "are pertinent to crafting an appropriate sentence." *United States v. Nellum,* No. 2:04-CR-30, 2005 BL 88941, at *4 (N.D. Ind. Feb. 3, 2005).  Additionally, in determining the particular sentence to be imposed, 18 U.S.C. §3553 (a)(l) requires consideration of the "history and

characteristics of the defendant." As discussed, Bailey shares a close relationship with his parents and sisters, and they have remained supportive and plan to continue their support throughout incarceration. *See United States v. Myers,* 353 F. Supp. 2d 1026, 1031 (S.D. Iowa 2005) (imposing non-Guidelines sentence where defendant had "been a steadfast and guiding presence his family's life"). *See, e.g., United States v. Schroeder,* 536 F.3d 746 (7th Cir. 2008) (remanding for resentencing where the sentencing court did not address defendant's claim of extraordinary family circumstances: "[w]hen a defendant presents an argument for a lower sentence based on extraordinary family circumstances, the relevant inquiry is the effect of the defendant's absence on his family members*"*).  *See also Benkahla,* 501 F. Supp. 2d. at 760 (awarding downward variance based on, among other things, defendant's "strong, positive relationships with friends, family and the community."); *United States v. Harding*, No. 05 CR 1285-02, 2006 WL 2850261, at *5 (S.D.N.Y. Sept. 28, 2006) (awarding a below Guidelines sentencing taking "note of the significant network" ready to support the defendant.)  Bailey's family is uniquely and deeply entrenched in their efforts to provide him support while he is incarcerated, and that support will continue in full force until and once he can come home to them.  The steadfast and guiding presence of his family is a proper consideration in imposing a below-Guideline sentence.  *See United States v. Myers*, 353 F, Supp. 2d. 1026, 1031 (S.D. Iowa 2005).

## NATURE AND CIRCUMSTANCES OF THE OFFENSE

The nature and circumstances of Bailey's offense conduct, while very serious, are less egregious than many similarly situated defendants facing the same offense at sentencing.  Counsel for the Defendant does not wish to, nor will it attempt to label the facts of this case as "run of the mill," as no cases involving this category of offenses can reasonably be labeled as such.  However,

7

the specific nature and circumstances of this offense are less serious than many which come before the Court, and there are indeed numerous mitigating factors present within the facts of this case.

The investigation into this matter began on December 4, 2024, by the Naval Criminal Investigative Service (NCIS) based upon evidence from the investigation into another United States Navy Sailor, Zhane Elamin, who investigators later determined was communicating with Mr. Burnett on social media. Elamin's investigation directly resulted in the subsequent investigation of Mr. Burnett. Mr. Burnett communicated with Elamin using the messaging platform Telegram and used Discord along with the file sharing site "Mega.NZ" to access CSAM material. Mr. Burnett later received information from Elamin suggesting he try the social media application "Tiya" where you can talk to underage females. Prior to this suggestion from Elamin, Bailey had never heard of or utilized Tiya.

A federal search warrant for Mr. Burnett and his phone was issued on August 20, 2025. He was at work onboard Naval Station Norfolk and was escorted to the NCIS office to be interviewed. While being interviewed Mr. Burnett was absolutely polite and cooperative with the interviewing agents. While he did at first deny knowledge of these offenses or the identity or existence of Elamin, it is notable that, after the agents left the room for a purported water break, almost immediately upon their return to the interrogation room, and entirely unprompted by the agents, Bailey began fully accepting responsibility for his conduct. He explained which platforms he obtained CSAM from or otherwise utilized, which included Telegram, Kik, Mega, Dropbox and the Dark Web as well as Discord and Tiya. Of significant importance, Bailey's own cooperation in speaking with the agents contributed to the severity of the sentencing guidelines he is facing. Had it not been for his full cooperation and openly answering all questions propounded upon him by the agents, he quite likely would not be facing the guideline range that he is.

Mr. Burnett admitted to having been "dealing with this thing I'm accused of for a long time" and he had tried to hide it because he understands it is wrong and something he is not proud of. He said he started looking for CSAM when he was 17 years old, had deleted things multiple times but came back to it most recently in May or June of 2025. These facts reflect an ongoing struggle that Bailey recognized as wrong, repeatedly attempted to address, and ultimately lacked the tools and support to overcome on his own. NCIS retrieved sixty-nine (69) media files of CSAM from Bailey's cellular telephone. Between the two Mega accounts there were a total of four hundred forty-eight (448) images and three thousand six hundred ninety-two (3,692) videos.

The basis of the charge at conviction was an online conversation with Minor Victim 1 (MV1) that took place with the 15-year-old female who lived in Italy. MV1 and Mr. Burnett would communicate through Facetime, iMessage and Discord but there was never an attempt to make contact outside of these media platforms, nor was there ever any planning or attempt to meet in person. Notably, Bailey never had any hands-on conduct with any minor victim, which is distinguishable from many defendants facing a court with the same charge.

The most significant mitigating factor, as it pertains to the facts of this case, has to do with MV1's statements to investigators, as well as her location. Counsel must clarify that in no way is the defense attempting to minimize the seriousness or illegality of the conduct by the following references – it is, however, incumbent upon counsel to distinguish the instant matter with many cases which involve far more serious conduct. MV1 was an Italian resident, residing in Italy. Had these conversations occurred wholly within Italy, between two Italian citizens, no law would have been broken, as the age of consent in Italy is 14 years of age. Additionally, based on her own statements, MV1 was fully aware of the age difference between her and Mr. Burnett, and the conversations were entirely consensual. Further, she stated that she found nothing wrong with Mr.

9

Burnett's requests, and she never felt in danger or that she was being forced into anything she did not want to do. MV1 stated that she would not be filing any police report against Mr. Burnett because "there was nothing to report," and everything was consensual. Finally, and of great significance, it was Mr. Burnett who ended their discussions, and, per MV1, once this ended, contact had been limited to a couple of instances *when she sought out Bailey*. (emphasis added).

## THE SENTENCING COMMISSION

In determining an appropriate sentence, the Court must "consider all of the 18 U.S.C § 3553(a) factors," "make an individualized assessment based on the facts presented," and explain how the facts relate to the purposes of sentencing. *Pepper v. United States*, 131 S. Ct. 1229, 1242-43 (2011). The Court's "overarching" duty is to "'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing." *Id*. at 101; *Pepper*, 131 S. Ct. at 1242-43. An inherent aspect of the applicable law is the authority of this Court to disagree with a Guideline as a matter of policy. Because "the Guidelines are now advisory…as a general matter, courts may vary based solely on policy considerations, including disagreements with the Guidelines." *Kimbrough*, 552 U.S. 85 at 101-02 (2007). As the Supreme Court held in *Kimbrough*, because "the cocaine Guidelines, like all other Guidelines, are advisory only," it "would not be an abuse of discretion for a District Court to conclude when sentencing a particular defendant that the crack/powder disparity yields a sentence 'greater than necessary" to achieve 18 U.S.C. § 3553(a)'s purposes." *Kimbrough*, 552 U.S. at 91, 109-10.

For the purposes of the discussion, *infra*, of the Guidelines and various enhancements, although defense counsel maintains its unresolved objection to the Guidelines as calculated by Probation, counsel will address the enhancements as-applied in the PSR, in the event the Court overrules the defense objection.

While Mr. Bailey is not facing an actual charge of CSAM distribution, because the Guidelines for the instant offense were calculated as if he were convicted of Distribution of Child Pornography, it is important to consider reports from the U.S. Sentencing Commission on CSAM guidelines.

In June of 2021, the United States Sentencing Commission released a report focusing on sentencing statistics from child pornography non-production cases from fiscal year 2019: *Federal Sentencing of Child Pornography: Non-Production Offenses* ("the Report"). The Report notes that, while non-production offenders generally received lengthy prison sentences, courts increasingly apply downward variances in response to the high guideline ranges that apply to the typical non-production child pornography offender. Statistically, in FY 2019: only 30% of non-production offenders received a sentence within the guideline range; and the majority (59%) of non-production offenders received a variance below the guideline range.

Early in the Report, in the "Key Findings" section, it is highlighted that, "(c)onstrained by statutory mandatory minimum penalties, congressional directives, and direct guideline amendments by Congress in the PROTECT Act of 2003, § 2G2.2 contains a series of enhancements that have not kept pace with technological advancements. Four of the six enhancements – accounting for a combined 13 offense levels – cover conduct that has become so ubiquitous that they now apply in the vast majority of cases sentenced under § 2G2.2." U.S. Sentencing Commission, *Federal Sentencing of Child Pornography: Non-Production Offenses*, 53, 2021.

Referencing the sentencing characteristics (enhancements), the Report notes that *nearly all* non-production offenders (over 95%) received enhancements for use of a computer and prepubescent minors. Specifically focusing on Distribution offenders in FY 2019: 96.8%

received a 2-point enhancement for prepubescent minor; 80% received a 2 to 7-point increase for distribution; 89.6% were enhanced 4 points for sadistic or masochistic conduct or abuse of an infant or toddler; 95.4% received the use of computer 2-point enhancement; and 97% were assigned a 2-5-level increase for number of images.  As the Commission succinctly states, "across all non-production child pornography offense types, § 2G2.2 fails to distinguish adequately between more and less severe offenders." *Id*. at 19. The characteristics of the underlying offenses create an artificially high suggested Guidelines sentence for someone like Bailey, and is likely why nearly 60% of all non-production offenders statistically receive a below-guidelines sentence.

The 2019 Report was generated as an update and expansion upon the Commission's 2012 Child Pornography Report to the Congress: Federal Child Pornography Offenses ("2012 Report").  The need for the 2019 Report was that, despite the litany of significant findings and suggestions stemming from the 2012 Report, Congress had yet to (and still, to this day has not) implement any of the Commission's statutory or guideline recommendations.

Like the findings from the 2012 and 2019 Reports, many of the enhancements applied to Mr. Burnett, while technically accurate (assuming *arguendo*, the Court affirms the PSR-calculated guidelines), doubly penalize him for conduct which is inherent in the offense itself. The Report acknowledged and affirmed that many such enhancements effectively apply to the overwhelming majority of offenders, resulting in the Guidelines' failure to differentiate among offenders in terms of their culpability.  As a result, sentencing enhancements that originally were intended to provide additional proportional punishment for aggravating conduct now routinely apply to the vast majority of offenders. The Commission concluded that the current sentencing scheme in §2G2.2 places a disproportionate emphasis on outdated measures of culpability

regarding offenders' collecting behavior and insufficient emphasis on offenders' community involvement and sexual dangerousness. The Commission asked Congress to enact legislation to provide it authority to amend the Guidelines that were promulgated pursuant to specific congressional directives or legislation directly amending the guidelines, and recommended that the specific offense characteristics related to the types and volume of images, distribution, and use of a computer be updated to account more meaningfully for the current spectrum of offense behavior regarding the nature of images, the volume of images, and other aspects of an offender's collecting behavior reflecting his culpability to reflect offenders' use of modern computer and Internet technologies. Congress, unfortunately, has failed to act upon both the 2012 and the 2021 Reports, and both the Court as well as litigants and defendants are thus mired in outdated and unreliable guidelines calculations.

In the case of Bailey Burnett, the Base Offense Level for this offense, as calculated by probation, is found in USSG § 2G2.2(a)(2), and is 22 points.  Bailey has been assessed six Specific Offense Characteristic enhancements, and the Chapter Four Enhancement, which cumulatively raise his offense level to 50, with a total offense level (after adjusting downward for acceptance of responsibility) of 47.  It is notable that, as stated in the PSR, "Pursuant to Chapter 5, Part A (comment n.2), in those rare instances where the total offense level (47) is calculated in excess of 43, the offense level will be treated as a 43." Presentence Investigation Report, p. 12. The fact that the guideline calculation is in excess of 43 and the subsequent need for this notation, considering the nature and circumstances of this offense, as well as the history and characteristics of Mr. Burnett, only serves to highlight the absurdity of the guidelines and enhancements in this particular case.

The six Specific Offense Characteristic enhancements are: 2 points for the offense involving a prepubescent minor (USSG § 2G2.2(b)(2)); 5 points for distribution in exchange for any valuable consideration, but not for pecuniary gain (USSG § 2G.2(b)(3)(B); 4 points for sadistic and masochistic conduct or infant or toddler (§ 2G2.2(b)(4)(B); 5 points for pattern of activity (§ 2G2.2(b)(5); 2 points for the use of a computer (USSG § 2G2.2(b)(6); and 600 or more images (§ 2G2.2(b)(7)(D). These six Specific Offense Characteristic enhancements result in the addition of 23 points to the guideline calculation. For reference, if 23 points were subtracted from the current "life" guideline total offense level of 43 points, the resulting range of 20 points would be 33-41 months. If it were not for the gracious reduction by the guidelines from Mr. Burnett's technically accurate score of 50 points downward to 45 points (prior to acceptance of responsibility reductions), the resulting range of 27 points would still only be 70-87 months. The Chapter Four Enhancement, which adds 5 points, is for a pattern of activity involving prohibited sexual conduct.

Mr. Burnett pleaded guilty to and is facing sentencing on one count of Coercion and Enticement of a Minor, in violation of 18 U.S.C. § 2422(b). The base offense level, per the Pre-Sentence Report, is not based on the offense at conviction, but instead on the entirely separate offense of Distribution of Child Pornography.

The defense maintains its unresolved objections to the calculation of the guidelines by Probation, as well as the duplicative enhancements. Should the Court determine that the guideline range calculated by Probation is accurate, the defense, despite acknowledging the validity of the various enhancements, would submit the following, and ask the Court to discount each in turn when calculating what it deems to be the appropriate sentence in this matter:

While technically accurate, the fact that 96.8% of distribution offenders in FY 2019 received enhancements for prepubescent minor should weigh heavily in favor of the Court considering not factoring in that 2-point enhancement.  If nearly one hundred percent of individuals are assessed an additional penalty for a specific factual enhancement, that should negate the significance of any such enhancement, as it does nothing to distinguish any one offender from the next, in terms of seriousness of the offense.  The defense submits that the Court should not consider the 2-point enhancement for prepubescent minor, as that, by way of unambiguous statistics, is something which at this point in time is inherent in the offense itself.

Although not as overwhelmingly applicable, distribution defendants still received the distribution enhancement in 80% of the cases.  Once again, the statistical odds of this enhancement being applied infer that this enhancement is also completely inherent in the offense itself. Further, though presented without the significance of a statistical number, common sense dictates that a defendant facing sentencing under distribution guidelines should not be further penalized for distribution.  There cannot be a clearer example of an enhancement being more inherent to the underlying offence than an enhancement for distribution in a distribution offense.

While certainly not endorsing or minimizing the conduct, the fact that 89.6% of all distribution offenders are enhanced by 4 points for sadistic or masochistic conduct or images involving toddlers or infants is notable.  Once again, the guidelines and their enhancements – which are purported to punish more severe offenders more severely – are categorically wrapping nearly 100% of offenders into the same group, and punishing almost 90% of them the exact same way.

Two of the most egregious categories of enhancements which entangle almost all offenders are the use of computer and number of images enhancements, applicable to 95.4% and

15

97% of all Distribution offenders, respectively.  Candidly, it is confounding to counsel how *any* offenders in 2019 or 2026 could be charged with or facing guidelines for Distribution and *not* be assigned the enhancement for use of computer, yet that number is still incredibly close to 100%. Additionally, as the Court is well aware, with the calculation of videos-to-images, it does not take much to get to 600 images, which is the highest-level enhancement for number of images. Unbelievably, an individual with only eight videos (which equates to 600 images, at the 75 images per video calculation in the Guidelines) will be assigned the same enhancement as an individual with one million (1,000,000) videos.  Neither of these enhancements should have had any relevance or applicability in 2019, much less today in 2026.

Finally, there is the issue of the pattern of activity enhancements.  These enhancements rear their head to the tune of 10 additional points, both via the § 2G2.2(b)(5) Specific Offence Characteristic Enhancement, as well as the Chapter Four Enhancement.  These enhancements, much like the Defendant's base guideline being Distribution and then additionally being assigned the enhancement for Distribution, are entirely duplicative and penalize Mr. Burnett twice for the exact same conduct – a pattern of activity involving the sexual abuse or exploitation of a minor/prohibited sexual conduct.  In fact, the definitions in the Application Notes for each of these enhancements both include reference that the enhancements apply when the facts support Production of Child Pornography.  Notably, Probation's Addendum to the Presentence Report specifically alludes to the Chapter Four Enhancement applying because "prohibited sexual conduct means the productions (sic) of child pornography." Presentence Investigation Report, p. 28. It is clear that, with the application of both the § 2G2.2(b)(5) and the Chapter Four Enhancements, Mr. Burnett is being doubly penalized for the exact same conduct.

16

Per Probation, the Adjusted Offense Level is 45, and the Chapter Four Enhancement elevates that to 50. Because the guidelines are so extraordinarily high – which results in an automatic reduction to a level of 43 (the highest possible guideline level) – although the PSR reflects minus-3 points for acceptance of responsibility, in reality, Mr. Burnett is receiving *zero* benefit for his acceptance of responsibility and timely notification of his intention to enter a plea of guilty.

If, as noted *supra*, the Court were to discount those enhancements which apply to the overwhelming majority of offenders (prepubescent minor [96.8%], distribution [80%], sadistic and masochistic [89.6], use of a computer [95.4%], and number of images [97%]), Mr. Burnett's Adjusted Offense Level (Subtotal) would be reduced from 45 to 27. This alone, even still considering the two pattern of activity enhancements, would reduce his Total Offense Level from 43 to 29, after appropriately giving Mr. Burnett the negative-3-point credit for acceptance of responsibility. The guideline range for a Category I offender with an offense level of 29 is 87-108 months, a far more appropriate guideline range for an individual in Mr. Burnett's situation. If the Court were to look at the guidelines with even more scrutiny, and discount either one of the two Pattern of Activity enhancements, that would reduce the total offense level even further, to 24. This would result in a guideline range of 51-63 months.

The Defense accordingly submits that the cumulative enhancements which raise the score to a Total Offense Level of 43 result in a Guideline range that is overly severe in view of the nature and circumstances of the subject offense committed by Bailey Burnett as well as the history and characteristics of Mr. Burnett, and the rest of the § 3553(a) factors.

## <u>ARGUMENT IN SUPPORT OF VARIANCE</u>

Counsel for the Defendant Bailey Burnett respectfully submits that a sentence of imprisonment for one hundred twenty (120) months, followed by ten (10) years of supervised release would be "sufficient, but not greater than necessary" to serve the purposes of sentencing set forth at 18 U.S.C. § 3553(a)(2).  The sentencing factors which the Court must consider are: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) need for the sentence to (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (3) the kind of sentences available; (4) the sentencing range established for the type of offense committed by the defendant as set forth in the United Stated Sentencing Guidelines; (5) the need to avoid unwanted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and (6) the need to provide restitution to any victims of the offense.

Fashioning a just sentence cannot be reduced to a mere arithmetical exercise. Reliance solely on numbers, quantities, offense levels, criminal history categories and matrixes produces an illusory precision that obscures the fact that sentencing, in the end, must involve the exercise of judgement, i.e. a judge's discerning opinion that results from identifying and weighing fairly all of the factors relevant to achieving the statutory sentencing goals.  See *United States v. Biheiri*, 356 F. Supp. 2d 589 (E.D.Va 2005).

Bailey is fully cognizant of the fact that this is not a victimless crime and that impact and harm has been inflicted upon the victim in this case, MV1, despite her present opinion that there was

no crime and she was consensually engaging in the conversation. He has discussed this with his family and counsel, and he has reached a clear understanding of how his actions negatively impact the victim. Additionally, through discussion with counsel, Bailey fully acknowledges that, despite MV1 being a willing participant in the relationship, his conduct was wholly inappropriate and as the adult he should have exercised far better judgement. This understanding was reached on his own and has been furthered during discussions with counsel, family, and upon deep personal reflection while awaiting sentencing incarcerated at Western Tidewater Regional Jail.

Bailey further recognizes that the minor children depicted in the images and videos he viewed and possessed are all individual victims, themselves. Upon discussion with Mr. Burnett, counsel is satisfied that Bailey truly comprehends both the initial victimization each one of these children endured when their images were preserved photographically, as well as the revictimization each endures every time their images are viewed or shared.

Bailey is also fully aware of the fact that regardless of the term of incarceration imposed upon him, he faces a lifetime of registration as a sex offender, and of having a federal felony conviction follow him for life. He understands the reality that, even should the Court concur with counsel's recommendation for a sentence of imprisonment for one hundred twenty (120) months, followed by ten (10) years of supervised release, he is effectively being handed a life sentence of being a convicted felon and registered sex offender. It is with a deep consciousness that he realizes the impact that registration will have upon his family due to the release of that information to the public community that his family resides in – they too will have to deal with the consequences of his conduct for many years to come. Courts have recognized the implication as to the serious collateral consequences inherent with a conviction of this nature, and have varied downward on this basis. *See e.g. U.S. v Pauley*, 511 F.3d 468,474-75 (4th Cir. 2007). As a federal

19

felon and registered sex offender, Mr. Burnett will be dealing with the consequences of his conduct for the rest of his life. Notably, and not specifically a punishment imposed by this Court, Mr. Burnett will also be missing out on being an active father to any children he may have later in life. Bailey will forgo all the joys that parents of young children get to experience, such as birthday parties, family vacations, youth recreational sports, school events – his conviction and sentence mandates him forgoing each of those memorable events. Even upon his release, Bailey will be forbidden due to being a registered sex offender and probationary rules, from attending those same milestone events.

Given these severe penalties, Mr. Burnett's undeniable acceptance of responsibility, his lack of significant criminal history, and his demonstrated amenability to treatment and court supervision, it is highly unlikely that he will violate the law again. In defense counsel's experience, a defendant's recidivism is, in part, directly correlated to the family support – or lack thereof – they have once charged with an offense, while incarcerated, and then upon their transition back into society. Fortunately for Bailey, the support he has at home has already and will continue to provide him with the best opportunities to maintain a healthy and law-abiding society.

The issue of specific deterrence is a sentencing factor for consideration under 18 U.S.C. § 3553 (a)(2)(C). The empirical evidence is unanimous that there is no relationship between sentence length and general or specific deterrence, regardless of the type of crime. *See* Andrew von Hirsch *et al.*, *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999) (concluding that "correlations between sentence severity and crime rates…were not sufficient to achieve statistical significance," and that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent

effects"); Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28-29 (2006) ("[I]ncreases in severity of punishments do not yield significant (if any) marginal deterrent effects…Three National Academy of Science panels reached that conclusion, as has every major survey of the evidence."); David Weisburd *et al.*, *Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes*, 33 Criminology 587 (1995) (finding no difference in deterrence for white collar offenders between probation and imprisonment); Donald P. Green & Daniel Winik, *Using Random Judge Assignments to Estimate the Effects of Incarceration and Probation on Recidivism among Drug Offenders*, 48 Criminology 357 (2010) (study of over a thousand offenders whose sentences varied substantially in prison time and probation found that such variations "have no detectable effect on rates of re-arrest," and that "[t]hose assigned by chance to receive prison time and their counterparts who received no prison time were re-arrested at similar rates over a four-year timeframe").

The Sentencing Commission has found that "[t]here is no correlation between recidivism and guidelines' offense level…While surprising at first glance, this finding should be expected. The guidelines' offense level is not intended or designed to predict recidivism." U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at 15 (2004) ["U.S. Sent'g Comm'n, *Measuring Recidivism*"]. *See also* Part IV.A.3, *infra*. And according to "the best available evidence…prisons do not reduce recidivism more than noncustodial sanctions." Francis T. Cullen *et al., Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011).

Additionally, while it is impossible to predict the actual impact of a sole sentence on an individual or any general population of individuals involved or considering becoming involved in similar offenses, it is certainly common knowledge that a mandatory minimum 10-year prison

21

sentence, a lifetime requirement to register as a sex offender, a lifetime being branded as a convicted felon, and a requirement for extensive post-release supervision *should* in and of themselves be an adequate general deterrent. If one were to assume that such persons were rational individuals, then it is not impossible to believe that they would not want to risk significant imprisonment, being compelled to list their home and work address, alongside their photograph and other identifying information, on publicly-accessible registries, nor would they readily be willing to forgo access to the general employment market.

18 U.S.C. §3553(a)(2)(C) mandates that the need to protect the public from further crimes of the Defendant be considered in fashioning an appropriate sentence. The following factor, to provide the Defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner, is most easily addressed in the same breath. At some point, regardless of the length of sentence, Mr. Burnett will have served his sentence and will hopefully be released from prison. The defense thus submits that it is not the length of the sentence which is important, but what transpires during that sentence and during the period of post-release supervision and/or probation that is important. Anyone – an alcoholic charged with DUI, a drug addict charged with possession of heroin, or a person charged with Mr. Burnett's offense – can be sentenced for a lengthy term and upon release fall back into the same behavior if the underlying issues are not addressed appropriately. The key to eliminating or reducing that risk substantially is the treatment they receive while incarcerated and/or upon their release while they are being closely supervised. The goal of this sentencing purpose is to protect the public indefinitely, not to simply keep them safe until a defendant is released. Fortunately for Mr. Burnett and the public, Bailey will be entering the federal prison system. Undersigned defense counsel routinely advises clients of the overwhelming benefits of the Federal Bureau of Prisons

22

versus the Virginia Department of Corrections, when it comes to actual rehabilitative programs available to inmates. Even during a prison sentence of one hundred twenty months and the ensuing supervised release, the Defendant will be subjected to intense treatment and behavioral restructuring by the Bureau of Prisons and United States Probation, and he will be required to strictly maintain all follow-up treatment as required by his probation officer.

In addressing the provisions of 18 U.S.C. § 3553(a)(6) pertaining to the need to avoid unwarranted sentence disparities among defendants with similar records who have been convicted of similar conduct, the defense would ask the Court to consider other cases with similarly-situated defendants. The defense submits that sentencing Mr. Burnett to imprisonment for one hundred twenty (120) months, followed by ten (10) years of supervised release is sufficient, but not greater than necessary, to serve the purposes of sentencing set forth at 18 U.S.C. § 3553.

In support thereof, the defense respectfully refers the Court to several cases of similarly-situated defendants, and their respective sentences. In *United States v. Clarke*, 842 F.3d 288, 293 (4th Cir. 2016), a jury found a defendant guilty of one count of attempted coercion and enticement of a minor, a violation of 18 U.S.C. § 2422(b), and the court sentenced the defendant to 120 months imprisonment and lifetime supervised release. This is notably different from Mr. Burnett, in that the sentence in *Clarke* came only upon conviction at a jury trial and included no acceptance of responsibility, no cooperation with the investigation, and at a significant cost to the Government for trial expense. In *Kennedy v. United States*, No. 1:13-cv-00076-MR, 2013 U.S. Dist. LEXIS 154271, at *2-5 (W.D.N.C. Oct. 28, 2013), a defendant was charged with possession of materials involving the sexual exploitation of minors, in violation of 18 U.S.C. § 2252(a)(4)(B); possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1); and coercion and enticement of a minor, in violation of 18 U.S.C. § 2422(b). The defendant

23

entered a plea for the count of coercion and enticement of a minor, with the other charges dismissed. The defendant was sentenced to 120 months imprisonment.

Perhaps the most notable and similarly-situated defendant to Mr. Burnett's case is that of Zhane Elamin, as discussed, *supra*. Elamin's arrest and investigation led directly to the investigation into Mr. Burnett, and Elamin was a significant contributing factor in Mr. Burnett's online activities. Elamin plead guilty in the Eastern District of Virginia, Norfolk Division to one count of Attempted Coercion and Enticement of a Minor, after engaging in a chat with an undercover agent, whom Elamin believed was a 13-year-old female. Despite the fact that Elamin engaged in sexual chats with someone two years younger than MV1, Elamin was offered a plea pursuant to Federal Rule of Criminal Procedure 11(c)(1)(B), wherein the Government *agreed* to recommend to the court that Elamin be sentenced to 120 months' imprisonment, which he ultimately received. *United States v. Elamin*, Case 2:24-cr-0003 (E.D.V.A. Oct. 21, 2024) (emphasis added). This is a stark difference from the situation that Mr. Burnett finds himself in: a standard, open-ended plea agreement, facing life in prison.

As to any fine and special assessments, the Court must consider, "among other things, the income, financial resources, and earning capacity of the defendant, as well as the burden that the [financial penalty] will impose upon the defendant and his dependents." *United States v. Lail*, 736 Fed. App'x 381, 382 (4th Cir. 2018) (per curiam) (quoting *United States v. Aramony*, 166 F.3d 655, 665 (4th Cir. 1999)); *see also United States v. Kelley*, 861 F.3d 790, 801 (8th Cir. 2017) ("[I]n the context of § 3014 indigency determinations, an analysis of both a defendant's current financial situation and his ability to pay in the future is appropriate in determining his 'non-indigent' status."). The factors under 18 U.S.C. § 3572, considered in determining the amount of assessments, include, among other things, the defendant's income, *earning capacity*,

and financial resources, the burden that the fine will impose upon the defendant and any dependent, whether restitution is ordered or made and the amount of such restitution, and the expected costs to the government of any imprisonment or term of supervised release. (emphasis added) 18 U.S.C. § 3572.

Counsel respectfully requests the Court consider the Defendant's future earning ability, and his ability to pay in the future. Bailey has spent a significant portion of his adult life training in a highly-specialized field of Armament Weapons Support Equipment Specialist. His service in the Navy, as well as most civilian employment in this field, requires security clearances and unrestricted access to ammunition. Most if not all security clearances and military or government property access requires applicants to be subjected to a background and criminal history check. Bailey's conviction in this matter, no matter the sentence imposed, will effectively eliminate any prospect of future employment in his specialized field.

### SUMMATION

The Defendant Bailey Burnett is before this Honorable Court for determination as to an appropriate sentence for the offense of Coercion and Enticement of a Minor in violation of § 18 U.S.C. 2422(b). While the defense is cognizant of the currently applicable sentencing guideline range of life (pending resolution of Defendant's unresolved objection), it is respectfully submitted that based upon the history and characteristics of Mr. Burnett, as well as all factors in 18 U.S.C. §3553(a), an appropriate sentence for Bailey Burnett is imprisonment for one hundred twenty (120) months, followed by ten (10) years of supervised release, and that said proposed sentence is "sufficient, but not greater than necessary" to serve the purposes of sentencing set forth at 18 U.S.C. §3553(a)(2).

Attached to this position paper are documents that the Defendant respectfully requests be reviewed by the Honorable Court prior to the sentencing hearing, as follows:

**A.  Military Awards List**

**B.  DD214**

**C.  High School Diploma, Briar Woods High School**

**D.  Southeastern Ministry Certificates of Achievement**

**E.  Photographs**

**F.  Character Letters**
1.  Nina Wood
2.  Karen Louise Brognard
3.  Chris Burnett
4.  Allen Hahn
5.  Linda Hahn
6.  Sandy Plender
7.  Billy D. Burnett
8.  James H. Small
9.  Lauren McCracken
10. Shelly Small
11. John Fred Burnett

**BAILEY BURNETT**

By _____/s/_____
          Defense Counsel

_____/s/_____
Jarrett L. McCormack, Esq.
Virginia State Bar No. 80675
Attorney for Bailey Burnett
McCormack & McCormack
Attorneys at Law
641 Lynnhaven Parkway, Suite 201
Virginia Beach, Virginia 23452

Phone:  757-463-7224
Fax:  757-463-5171
jlm@mccormackpc.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 29th day of May, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Jeremy McKinnon, Esquire
Assistant U.S. Attorney
101 West Main Street
Suite 8000
Norfolk, Virginia 23510
Phone: 757-441-3040
Jeremy.mckinnon@usdoj.gov

_____/s/_____
Jarrett L. McCormack, Esq.
Virginia State Bar No. 80675
Attorney for Bailey Burnett
McCormack & McCormack
Attorneys at Law
641 Lynnhaven Parkway, Suite 201
Virginia Beach, Virginia 23452
Phone:  757-463-7224
Fax:  757-463-5171
jlm@mccormackpc.com

I further certify that on this 29th day of May, 2026, I caused a true and correct copy of the foregoing Position of the Defendant with Respect to Sentencing Factors to be e-mailed to the following:

Nicole Pender
United States Probation Officer
600 Granby Street
Suite 200
Norfolk, Virginia 23510
Phone: 757-222-7308
Nicole_pender@vaep.uscourts.gov

27

_____/s/_____
Jarrett L. McCormack, Esq.
Virginia State Bar No. 80675
Attorney for Bailey Burnett
McCormack & McCormack
Attorneys at Law
641 Lynnhaven Parkway, Suite 201
Virginia Beach, Virginia 23452
Phone:  757-463-7224
Fax:  757-463-5171
jlm@mccormackpc.com